# Reeves *v.* The State.

*Indictment for Embezzlement against Bank President.*

95　31
123　19

95　31
133　189

95　31
134　449

1. *Sufficiency of indictment.*—An indictment against the president or other officer of a bank incorporated under the laws of this State, in the form prescribed by the Code (Form No. 39; Code, p. 270), charging that he, being such officer, "embezzled, or fraudulently converted to his own use, money to about the amount of $558, which was in the possession of said bank, or deposited therein," is sufficient to authorize a conviction for the embezzlement or fraudulent conversion of money belonging to the bank itself, or deposited therein on general or special account; and though the money was a special deposit, it is not necessary to aver the name of the owner.

2. *Embezzlement by bank officer.*—Under statutory provisions (Code, § 3796), a bank officer may be convicted of embezzling, or fraudulently converting to his own use, money belonging to the bank, or deposited therein, although his possession and control was not exclusive of the other officers; it is immaterial whether his acts were perpetrated secretly or openly, with or without the assent and concurrence of the other officers; if consummated under the guise of a fraudulent loan, made with the assent of the other officers, and regularly credited on the books as an ordinary business transaction, this would not eliminate the criminality of the act; and the fraudulent intent may be inferred by the jury from the misappropriation of the funds.

3. *Same; evidence.*—In a criminal prosecution against a bank officer for embezzlement, as in other cases involving the question of fraud or fraudulent intent, great latitude is allowed in the range of the evidence, and it is permissible to prove other acts and transactions of similar character, at or about the same time, on the part of the defendant and the other officers, amounting to a misappropriation of the funds of the bank, though entered on its books as loans to each of them, culminating in its failure and assignment at the end of the year; also, that the defendant and his brother, president and vice-president, owned nearly all the stock of the bank, drew out of it during the year, as loans, amounts equal to their stock, and were in-

[Reeves v. The State.]

solvent when the bank failed; also, that their respective wives each owned a valuable estate, including a plantation which the brothers cultivated jointly during the year, and for which advances were drawn from the bank as loans about equal to its full value. All of this evidence, though relating to acts which might constitute several criminal offenses, is within the legitimate range of the inquiry, tending to show "a long course of unlawful dealing in the affairs and management of the bank, of which defendant could not have been ignorant, and which could not have occurred without his participation, and may shed light on the motives and intent influencing him in the admitted appropriation to his own use of the money drawn out by him on his several checks, including the one on which the indictment is based."

4. *Same.*—The fact that the defendant's brother, who was the vice-president of the bank, kept a private box of papers in the bank, and secretly removed it without the defendant's knowledge, the night before the bank made an assignment, is not relevant or admissible as evidence for any purpose, and its admission is error.

5. *Charge given, but not handed to jury.*—If an erroneous charge, requested by the defendant, is marken *Given* by the presiding judge, but by mistake is placed among the charges refused, and does not go into the hands of the jury, there is nothing in this of which the defendant can complain.

6. *Refusal of new trial.*—The overruling of a motion for a new trial in a criminal case is not revisable, though an appeal is given by statute in a civil case.

FROM the Circuit Court of Bullock, on change of venue from Barbour.

Tried before Hon. JESSE M. CARMICHAEL.

The defendant in this case was indicted for embezzlement as a bank officer, was convicted, and sentenced to the penitentiary for the term of three years. The indictment was found at the June term, 1891, and contained four counts. The judgment-entry recites that the defendant "interposed a demurrer to the indictment, as shown by the record, which demurrer was overruled by the court;" but the grounds of demurrer are nowhere stated. On the trial, the State elected to proceed on the second count of the indictment, which charged that William N. Reeves, "an officer and president of the *John McNab Bank,* a bank incorporated under the laws of this State, embezzled, or fraudulently converted to his own use, money to about the amount of $558.34, which was in the possession of said bank, or deposited therein; against the peace," etc. Issue was joined on the plea of not guilty. The opinion of Judge THORINGTON contains a very full statement of the evidence, and renders any further statement unnecessary. In addition to the exceptions to evidence, stated in the opinion, the defendant reserved exceptions to the refusal of each of the following charges, asked by him in writing:

[Reeves v. The State.]

(1.) "If the jury believe from the evidence that the defendant, at the time he received the $558.34 from the bank, had no intent to injure or defraud the bank, then they will find him not guilty; and if, from all the evidence, they have a reasonable doubt of the fact that, at the time he received the money, he had the intent to embezzle the same, or fraudulently convert the same to his own use, they must acquit him." (2.) "If the jury believe from the evidence that when the defendant received the $558.34 from the bank, he received it as a loan, to be repaid out of the proceeds of the crop to be grown on the plantation in Russell county, and had good reason to believe, and did believe, that said sum, and all other sums advanced to him by the bank during the year for the use of the plantation, would be. repaid to the bank from said crops; and that he had, at the time the several sums were received by him from the bank, no intent to embezzle the same, or fraudulently convert the same to his own use,—then their verdict must be for the defendant." (3.) "If the jury, on consideration of all the evidence.in the case, can reasonably conclude that the defendant, at the time he received the $558.34 from the bank, had no intent of embezzling the same, or fraudulently converting it to his own use, then it is their duty to acquit him." (4.) "When a good or bad motive for doing an act can be imputed to the person doing the act, the law says the good motive must be imputed, if the same can be done from the evidence reasonably to the satisfaction of the jury; and before the jury can say that the defendant in this case is guilty, they must be satisfied from the evidence, beyond all reasonable doubt, that when he received the money from the bank he intended to embezzle it, or fraudulently convert it to his own use; and if they have a reasonable doubt, growing out of the evidence, that the defendant at the time intended to embezzle the same, or fraudulently convert it to his own use, they must find him not guilty."

The action of the court in reference to these charges, and the defendant's exception to that action, are thus stated in the bill of exceptions: "The above charges, numbered from one to four inclusive, with the addition of the words, '*and used it*,' referring to the money after it was obtained, were given by the court. The court refused to give said written charges, and the defendant excepted to *such* (?) refusal."

The defendant requested also the following charges in writing, and excepted to their refusal as stated :

(5.) "The law makes all money, put into the bank on general deposit,. the absolute property of said bank, and au-

thorizes and empowers said bank to use said money as its own in any lawful way; and if the jury believe from the evidence that the proper authorities or officers of the bank consented and agreed to lend said sum of $558.34 to defendant, in the usual way and manner of doing business by said bank, they must find the defendant not guilty."

(6.) "If the jury believe from the evidence that when the defendant discounted the draft for $7,480, the same was so discounted by the bank with the full knowledge and consent of the officers and managers of its affairs, and by authority and consent of a majority of the board of directors of said bank, and he paid to the bank the interest or discount on said draft in the usual and customary way; and that the money arising from the discount of said draft was used by the defendant *bona fide* in defraying the expenses of running the Russell county plantation during the year 1890; and that the cotton crops to be grown on said plantation during that year were to be used by said defendant in repaying said amount to the bank; and that the defendant believed, and had good reason to believe, that said cotton crops to be raised that year on said plantation would be sufficient to repay said amount; and that defendant, by reason of the failure of the cotton crop on said plantation during that year, could not repay said amount to the bank in full; and that said defendant, at the time said draft was discounted, had no intent to embezzle the same, or fraudulently convert it to his own use,—then they must acquit the defendant."

(7.) "If the jury believe from the evidence that the $558.34 was loaned by the bank to W. N. and J. H. Reeves in good faith, and in the regular course of business, then they must acquit the defendant."

(8.) "Although the jury may believe from the evidence that the affairs of the bank were not managed with the highest degree of care and skill, yet, if they believe that the $558.34 was loaned by the bank in good faith to said W. N. and J. H. Reeves, and in the usual and customary way, they must acquit the defendant."

(9.) "Before the jury can convict the defendant in this case, they must believe from the evidence, beyond a reasonable doubt, that the money paid by the bank on the check for $558.34 was paid out of money which was placed in and held by the bank as a special or specific deposit."

(10.) "If the jury believe from the evidence that the check for $558.34 was paid by the bank out of money held by it on general deposit, they must find the defendant not guilty."

[Reeves v. The State.]

(11.) "If the check for $558.34 was drawn on the bank by the defendant, and the money on the same was paid to him by the bank with the knowledge and consent of the officers and managers of the affairs of the bank, and there was no fraud practiced by the defendant in obtaining said money, then the jury will find him not guilty."

(12.) "If the jury believe from the evidence that the defendant, when he drew the check for $558.34 in favor of Ex. Tucker, honestly believed that he had the right to draw the check and use the money as the evidence shows it was used, then they must find him not guilty."

(13.) "If the jury believe from the evidence that the check for $558.34, drawn by the defendant on the 23d June, 1890, was known to and authorized by the other ministerial officers of the bank, they must find defendant not guilty."

(14.) "If the jury believe the evidence in the case, they must find the defendant not guilty."

Each of these charges was refused by the court except the 12th, which was marked *Given*, and intended to be given, but by mistake was placed among the charges refused, "and was not read to the jury, nor considered by them in making up their verdict; and defendant excepted to the action of the court in respect to said charge." The bill of exceptions adds: "But the court gave substantially the same charge, generally and specially, at the request of the defendant."

G. L. COMER, HENRY R. SHORTER, and WATTS & SON, for appellant.—(1.) The statute is aimed at the embezzlement or fraudulent conversion, by a bank officer, (1) of money belonging to the bank, (2) of money in the possession of the bank, or (3) deposited therein. The latter words can only refer to money on special or specific deposit, for money deposited on general account becomes at once the property of the bank, and creates the relation of debtor and creditor between the bank and the depositor.—Morse on Banking, vol. 1, § 289; *Wray v. Tuskegee Insurance Co.*, 34 Ala. 58; *Wright v. Paine*, 62 Ala. 340; *Henry v. Northern Bank*, 63 Ala. 540; *Thompson v. Riggs*, 5 Wall. 678; *Bank v. Miller*, 10 Wall. 152: 16 Wall. 483; *People v. Hone*, 2 N. Y. 387; *Com. v. Sterns*, 2 Metc. Mass. 343; *Com. v. Libby*, 11 Ib. 64; *Nobles v. State*, 59 Ala. 73. The indictment does not follow the words of the statute, omitting entirely "money belonging to the bank," and thus narrowing the charge to the embezzlement of money on special or specific deposit; and as such, the names of the owners, or depositors, should have been stated. (2.) If the indictment was sufficient to au-

[Reeves v. The State.]

thorize a conviction for the embezzlement of money on special deposit, there was no evidence to sustain it; and if the evidence was sufficient to support a conviction for the embezzlement of money belonging to the bank, or deposited with it on general account, there was a fatal variance between it and the charge in the indictment. (3.) It is submitted that the evidence fails to establish any embezzlement at all, or fraudulent conversion, which involves secrecy or concealment. Every transaction shown by the evidence was made openly, with the knowledge and assent of the proper officers of the bank, and was correctly entered on the books of the bank like other regular business transactions, negativing any fraudulent intent.—2 Russ. Crimes, 181–84; 2 Bish. Crim. Law, § 209; *State v. Mayo*, 30 Ala. 32; *Nobles v. State*, 59 Ala. 73. (4.) The prosecution having elected to proceed on the second count, which charged the embezzlement of $558.34, as shown by the check of June 23d, 1890, the evidence ought to have been confined to that single transaction; yet the court allowed evidence of numerous other transactions, each of which might have been the foundation of a separate criminal prosecution.—*Mayo v. State*, 30 Ala. 32; *Gassenheimer v. State*, 52 Ala. 312; *Smith v. State*, 52 Ala. 384; *Bass v. State*, 63 Ala. 108. (5.) Much evidence was admitted by the court, outside of these other alleged criminal transactions, which was entirely irrelevant to any issue in the case; as, the amount of stock in the bank held by the defendant, his brother, and the other officers, and the amounts drawn out by each of them; the amount of property owned by the defendant's wife and his brother's wife respectively, and their own insolvency; the location of the doors of the bank, in connection with other parts of the building; the removal by the defendant's brother, without his knowledge or assent, of a box of private papers from the bank building, &c. Each part of this evidence was irrelevant, and its admission was error.—*Carson v. State*, 50 Ala. 134; *Mitchell v. State*, 60 Ala. 26.

WM. L. MARTIN, Attorney-General, for the State.—(1.) The indictment is in the form prescribed by the Code, and is therefore sufficient.—*Huffman v. State*, 89 Ala. 33; *Lowenthal v. State*, 32 Ala. 589. Its legal effect is to charge each and every act denounced by the statute, and authorize a conviction on proof of any one of those acts. Moreover, the record does not show what grounds of demurrer, if any, were specified; and this court will presume that none were specified. (2.) The evident purpose of the statute is to protect

the money, property and effects belonging to the bank, or
in its possession, or deposited therein, against the ravages
of its officers and agents, to whom the care and manage-
ment of its affairs are necessarily intrusted; to preserve
such funds inviolate for the legitimate uses and purposes of
the bank, its creditors, depositors and stockholders.  The
officers of the bank are the mere custodians and managers
of its funds, for the purposes of the corporation as pre-
scribed by law, and are without authority to use or lend its
moneys except as authorized by law.—Code, § 1525.   The
statute has never received a judicial construction in any
reported case, but a similar statute of the United States
has been construed in the cases of *United States v. Taintor*,
11 Blatch. C. C. 374, and *United States v. Harper*, 33 Fed.
Rep. 471–81. See, also, 6 Amer. & Eng. Encyc. Law, 483–86.
These authorities show that the "intent to injure or de-
fraud," as the words are used in the statute, means nothing
more than that general intent to injure or defraud, which,
in contemplation of law, always arises when one willfully
and intentionally does an act which is illegal or fraudulent,
and which, in its necessary or natural consequence, must
injure another; that the intent to injure or defraud is con-
clusively presumed, when the unlawful act was knowingly
committed, and injury to another resulted, because no one
can be heard to say that he did not intend the natural or
necessary consequence of his own willful act.   (3.)  In such
a case as this, necessarily involving a charge of fraud, the
prosecution is not limited to the particular act charged, but
may adduce evidence of other similar acts as relevant to the
question of intent.   A single act of conversion, isolated and
unexplained, may amount to nothing; while a series of such
acts, scrutinized in the light of all the attending facts and
circumstances, may establish a systematic plan of plunder
with fraudulent intent.—*Stanley v. State*, 88 Ala. 154; Whart.
Crim. Ev., §§ 38, 46; 6 Amer. & Eng. Encyc. Law, 501. That
the defendant's financial condition may be shown, see 6
Amer. & Eng. Encyc. Law, 503.

THORINGTON, J.—The statute under which the defend-
ant was indicted declares, that "Any officer, agent, clerk, or
servant of any bank incorporated under any law of this State,
who embezzles, or fraudulently converts to his own use, or
fraudulently secretes with intent to convert to his own use,
any money, property or effects, belonging to, or in the pos-
session of such bank, or deposited therein, must be pun-
ished, on conviction, as if he had stolen it."—Code, § 3796.

[Reeves v. The State.]

This statute first appeared in the laws of this State in the Code of 1852, but there it embraced in its terms private bankers, commission-merchants, factors, brokers, attorneys and other agents. It was brought forward into the Revised Code of 1867, in the language we now find it in the Code of 1886, having been successively carried forward from the Revised Code into the Code of 18 ¡6, and from that into the present Code.

Counsel have cited no decision of this court construing the provisions of this statute, nor have we been able to discover any after careful investigation. An analysis of the statute shows that, in order to constitute an offense against its provisions, there must exist the following concurring facts : (1.) The party accused must be an officer, agent, clerk, or servant of a bank incorporated under the laws of this State. (2.) The money, property or effects must have belonged to, or been in the possession of, or been deposited in such bank. (3.) The money, property, or effects must have been embezzled by the accused, or fraudulently converted to his own use, or secreted by him with intent to convert to his own use.

For indictments under this, and other statutes, the Code prescribes forms, and declares that they shall, in all cases in which they are applicable, be deemed sufficient.—Code of 1886, vol. 2, § 4899, Form No. 39. The form laid down for cases of this character omits the words in the statute "belonging to such bank," and also the words "or fraudulently secretes with intent to convert to his own use," and provides only for the embezzlement, or fraudulent conversion of money, property, or effects, which were *in the possession of such bank*, or *deposited therein*. Why this is so does not appear, except as indicated by the language of said section 4899, from which language it may be inferred that a form analogous to that given in No. 39 was intended to be used for charging offenses coming within the omitted language, instead of within the language found in said form.

The indictment in this case, following the form in the Code, charges that the money, property or effects "were in the possession of, or deposited in the bank." For objection to the sufficiency of the indictment counsel for appellant insist, that the statute, in the use of the words "money, property and effects belonging to the bank," contemplates money, property and effects of which the bank is the owner, and by the words, "in possession of such bank, or deposited therein," it refers necessarily to money, property or effects belonging to others than the bank; that all money deposited

[Reeves v. The State.]

generally, *eo instanti*, becomes the property of the bank, the relation of debtor and creditor immediately arising upon the general deposit being made; that, therefore, the words "in possession of such bank, or deposited therein," can only refer to special deposits of money, property or effects, where the title and ownership remain in the depositor, the bank becoming the bailee of the depositor; and from this it is argued that the indictment is defective in not averring the ownership of the money it alleges defendant embezzled.

Any sound interpretation of this statute must take into account the nature and fundamental objects of banks, and the fact that the statute refers to incorporated banks, and must dissociate from the legal entity, the bank itself, the individuals who happen to be its officers, agents or servants.

In Morse on Banks and Banking, vol. 1, § 41 (b), in speaking of these objects, it is said: "The chief of these being to provide a place of safety in which the public may keep money and other valuables, and to lend its own money, and that of others deposited with it (unless specially deposited), for a profit, and to act as agent in the remission and collection of money. If it is by its organic law a bank of issue, it has one more fundamental purpose, namely, to provide the public with a convenient currency in the shape of promissory notes intended to circulate as money."

The business of this and other countries is so largely conducted and influenced by the banks, and those dealing with them, as well as the stockholders themselves, are compelled, in the nature of such business, to repose in their officers such implicit confidence, it becomes of the highest consideration that every reasonable safeguard should be provided by the law to secure fidelity on the part of bank officials and the proper exercise of the extraordinary privileges accorded to such corporations. The statute under consideration is one aimed in that direction, and should not be eviscerated by a narrow construction that would fall short of, or defeat, the object of its enactment.

In using the words "or deposited therein," the legislature must be deemed to have known what kind of deposits usually and ordinarily appertain to the banking business; and there is nothing in the language of the statute that manifests any intention to restrict the meaning of the words last quoted to any particular class or character of such deposits.

There are three classes of deposits recognized by law, and in the banking business—viz., special, specific, and general. *Special*, where the whole contract, express or implied, is that

the thing deposited shall be safely kept. and that identical thing returned to the depositor. *Specific*, where money is deposited to pay a check drawn, or to be drawn, or for any purpose other than mere safe-keeping, or entry on general account; the title remaining in the depositor until the bank pays the person for whom it is intended, or promises to pay it to him. *General*, all deposits not expressly made special or specific, or unless the circumstances are such as to imply that the deposit is not meant to be general, as where the money is deposited inclosed in a box, or bag, or sealed up. 1 Morse on Banks and Banking, §§ 185, 186. See, also, Code of 1886, § 1525, subd. 7.

Obviously, the purpose of the statute is to extend protection to the bank itself, as well as to its depositors or customers, against the unfaithfulness of its officers, agents and servants; and, to this end, it makes it felony for such officer, agent or servant to embezzle, or fraudulently convert to his own use, any money in the possession of the bank, whether its own or that of a depositor. Money, property or effects *belonging to the bank* may be the subject of embezzlement, or fraudulent conversion, under this statute, without being in the possession of, or having been deposited in the bank, provided the same came lawfully into the hands of the accused by virtue of his office or employment; but not so as to the money, property or effects of others than the bank; these last, in order to be the subject of embezzlement, or fraudulent conversion, under the terms of the statute, must be *in the possession of the bank, or have been deposited therein.* And the statute evidently assumes that, as to these last, an indictment is sufficiently certain which charges that they were deposited in, or in the possession of the bank. In the eye of the statute, it can make no difference whether the money, property or effects come into the possession of the bank by special or general deposit, nor who is the actual owner thereof. Although, in the one case, the title may be in the individual making the special deposit, and in the other in the bank, by reason of the legal relation between bank and customer arising from the general deposit, it is no more the property of the officer, or agent or servant of the bank in the one case than the other; his identity is as separate and distinct from that of the bank as it is from that of any depositor or customer of the bank. It is but a reasonable construction of the statute to hold that an indictment containing the other necessary averments, and which charges that the money, property or effects embezzled were in possession of, or deposited in such bank, sufficiently charges

the ownership of the property; and this, whether the money, property or effects, were in possession of the bank by general or special deposit.—6 Am. & Eng. Encyc. of Law, 505.

It has been held under general statutes of embezzlement, that it is unnecessary for the indictment to aver ownership of the property as a fact separate and distinct from the necessary inference of such ownership based on the relation of principal and agent, and the fact that the property embezzled came to the servant's possession by virtue of his employment; but, if alleged, it must be proven strictly. *Washington v. The State,* 72 Ala. 272. So, under this statute, if the relation of officer, agent, clerk or servant, towards the bank, be averred, it satisfies the statute; the bank is to be regarded as the owner of the money, property or effects embezzled, whether the same came into its possession by general, or special, or specific deposit. Moreover, the indictment follows the form prescribed by law, and was properly sustained.—Code of 1886, § 489.1, and Form No. 39; *Huffman v. The State,* 89 Ala. 33; *Lowenthal v. The State,* 32 Ala. 689.

The word "embezzles", used in the statute, is one having a technical meaning, and that meaning suggests the character and scope of the proof required to sustain the charge. It involves two general ingredients, or elements : first, a breach of duty or trust in respect of money, property or effects in the party's possession, belonging to another; secondly, the wrongful or fraudulent appropriation thereof to his own use. There must be the actual and lawful possession or custody of the property of another by virtue of some trust, duty, agency or employment on the part of the accused; and while so lawfully in the possession of such property, it must be unlawfully and fraudulently converted to the use of the person so in the possession and custody thereof; and, in prosecutions under the statute herein referred to, the person charged must be an officer, agent, clerk or servant of a bank incorporated under the laws of this State, and the property must be money, property or effects belonging to, or in the possession of such bank, or deposited therein. Money, property or effects, however, belonging to, or in the possession of such bank, or deposited therein, may at the same time be in the possession of the bank and of such officer, agent, clerk or servant, by virtue of his office, agency or employment; and if they were, previously to their wrongful appropriation, lawfully in the possession and custody of the bank and the defendant as an officer, agent, clerk or servant of the bank, and are, while

so held by him, fraudulently converted to his own use, this would be embezzlement, or fraudulent conversion, within the terms of the statute. Exclusive possession, therefore, of the money, property or effects by the accused, at the time of their wrongful conversion to his own use, is not necessary in order to constitute the offense created by this statute.

If the money, property or effects of the bank, or, in other words, the business of the bank, of which such money, property or effects constitute a part, are actually or practically intrusted to the care and management of such officer, agent, clerk or servant, to such an extent that by virtue of his office, agency or employment, he has the actual custody or possession of such money, property or effects, or such access thereto as enables him to exercise control over the same, and that would place him in the lawful possession of such money, property or effects, and if while so in the lawful possession of such money, property or effects, as above stated, he fraudulently converts any portion thereof to his own use, he would thereby commit the offense denounced by the statute.

Stating the proposition in another form, it may be said that, if the office, agency, or employment of the accused gives him a joint or concurrent possession and custody of the money, property or effects of the bank with the cashier, teller, or other officer or agent of the bank, and if he, while so in possession, either alone or jointly with such other officers or agents of the bank, fraudulently converts such money, property, or effects, or any part thereof, to his own use, he would be guilty of embezzlement within the meaning of the statute.

In embezzlement, as in most crimes, the essence of the offense, or that which makes it criminal, is the intent with which the act is done. But that intent may be shown, or may be conclusively presumed, from the doing of the wrongful, fraudulent and illegal acts, which, in their necessary results, naturally produce loss or injury to the person, natural or artificial, against whom the offense is committed. "The law presumes that every man intends the legitimate consequence of his acts. Wrongful acts, knowingly or intentionally committed, can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intention to injure or defraud is presumed, when the unlawful act which results in loss or injury is proved to have been knowingly committed. This is the well settled rule which the law ap-

plies in both civil and crimnal cases involving the question of intent."—*United States v. Harper*, 33 Fed. Rep., 471; *United States v. Taiulor*, 11 Blatch. C. C. Rep. 394.

Under an indictment based on the statute we are considering, the *gravamen* of the charge is the fraudulent conversion; and in the nature of the case much latitude must be given to the evidence in order to establish the crime. "As a general rule, great latitude is allowed in the range of evidence, when the question of fraud is involved. It is indispensable to truth and justice that it should be so."—*Snodgrass v. Br. Bank of Decatur*, 25 Ala. 175. Fraud is rarely susceptible, in any case, of direct, positive proof, for the reason that its ways are dark and sinuous, and its tracks carefully concealed. In embezzlement generally, and especially in cases such as this now before us, the very confidence and trust reposed furnish the most potent means for its accomplishment and effectual concealment, so that guilt can generally be established only by reasonable inferences drawn from the general course of conduct of such officer, agent, clerk or servant, with respect to the subject-matter of his trust, and from all the facts and circumstances surrounding his acts, which tend to throw light upon or illustrate their nature.—*Ker v. People*, 110 Ill. 627. And upon this principle evidence of other offenses, similar to those charged in the indictment, is admissible. A single act charged in an indictment, standing alone, might be susceptible of inferences of honesty of purpose, or of mere mistake; which, when viewed in the light of a long course of conduct, and of repeated acts of a similar nature intimately and directly connected with the particular accusation, would be utterly inconsistent with such inferences, and the fraudulent intent, with which the particular act was done, demonstrated beyond all reasonable doubt.—*United States v. Lee*, 12 Fed. Rep. 816; *Stanley v. State*, 88 Ala 154; *Hawes v. State*, 88 Ala. 37; *Ker v. People*, 110 Ill. 627; *Jackson v. State*, 76 Ga. 551; 1 Roscoe's Crim. Ev., top pages 138, 139, 151, 152. "It is hardly ever possible to prove fraud, except by a comprehensive and comparative view of the action of the party to whom the fraud is imputed, and his relative position a reasonable time before, at, and a reasonable time after the time at which the act of fraud is alleged to have been committed."—*Snodgrass v. Br. Bank at Decatur, supra*.

The offense denounced in this statute may not only be committed by one of the officers, agents, clerks or servants of the bank, secretly and alone, and without the knowledge

[Reeves v. The State.]

or co-operation of others engaged in the management of the bank, but it may also be accomplished by collusion of such other officers, agents, clerks or servants, or any of them, with the one accused, whereby he is enabled fraudulently to convert to his own use money, property or effects belonging to, deposited in, or in possession of the bank. Officers of an incorporated bank, and the bank itself, are different and distinct entities. The former are in no sense the owners of the corporate property, entitled to deal with it as their own, or as they may deem proper. They are the mere custodians and managers of the money, property and effects of the corporation, for the purposes prescribed by, or necessarily implied in the law of its being, and are without authority to use, lend, or otherwise deal with the money of the bank, except as authorized by law.—Code 1886, § 1525. Loans may be made contrary to law, and in disregard of the usual and ordinary precautions taken by banks generally, without subjecting the officers by or to whom such loans may be made to the charge of embezzlement, although they may be palpable violations of duty. But we do not question that the statute may be violated by fraudulent transactions under the guise of loans, made with full knowledge of the managing officers or agents of the bank. The distinction is between the making of mere irregular, unsafe, or reckless loans of the bank's money, which would amount to maladministration only, and pretended loans, made in bad faith for personal advantage and with fraudulent intent, the pretended borrower being an officer, agent, clerk or servant, having control and custody of money of the bank by virtue of his office or employment, which control and custody is shared by those making the pretended fraudulent loan, and who participate in the fraudulent purpose of the pretended borrower. And in cases which assume this phase, it may become essential that the evidence should be permitted to take such range as to show the relationship existing between such managing officers, their management of the funds of the bank with respect to each other, the transactions they have had or permitted with each other, involving the use of the bank's money, outside of and beyond the usual course of dealing of the bank, similar to, or connected with, the loan which is brought in question by the indictment. and illustrative of the real purpose and intent with which the latter was made.

A transaction such as is herein above referred to would not be a ,oan in any sense of the law; it would be a fraud, and such fraud may be accompanied by facts and circum-

stances which would constitute it embezzlement, or a fraud-
ulent conversion to the use of the accused, within the
meaning of this statute. "The fraudulent conversion may
be consummated in any manner capable of effecting it."
6 Amer. & Eng. Encyc. of Law, pp. 452, 453.

Some of the principles hereinabove declared are sug-
gested, and others fully supported, by the case of *U. S. v.
Harper*, 33 Fed. Rep. 471.

We will now take up the facts of the case with the view
of considering whether or not, in the light of the principles
above dcelared, the trial court ruled correctly on the nu-
merous exceptions to the testimony. The John McNab
Bank was incorporated on the 14th day of April, 1883, under
the laws of this State, with an authorized capital of
$100,000.00, its place of business being the city of Eufaula,
Alabama. During the year 1890, and up to the failure of
the bank in March, 1891, the stockholders and directors of
the bank consisted of the defendant, Wm. N. Reeves, his
brother, J. H. Reeves, defendant's son, J. M. Reeves, and
one Rhodes; of whom the defendant was president of the
bank, his brother was vice-president, and Rhodes was
cashier. Defendant owned $49,000 of the capital stock, his
brother $40,000, Rhodes $6,000, and defendant's son $5,000.

In the latter part of the year 1889, defendant and his
brother, the said J. H. Reeves, engaged in the cultivation of
a plantation in Russell county which belonged to their
wives, who had acquired the same from their father, John
McNab; and defendant's testimony tends to show that he
and his brother, with that purpose in view, conferred with
Rhodes, a stockholder, director and cashier, and that it was
agreed by and between the three, as officers of the bank,
that the bank should advance to defendant and his brother
money to run the plantation during the year 1890, with the
understanding, as defendant testified, that the cotton crops
grown on said plantation that year should be applied to the
payment of whatever sums might be so advanced by the
bank for the use of the said plantation. The plantation
was accordingly cultivated and managed that year, as de-
fendant testified, by defendant and his brother, without con-
sulting their wives, and without any rent contracts being
made with them.

On the 23d of June, 1890, defendant drew a check on said
bank for $558.34 payable to Exton Tucker, or bearer, the
check being signed "Russell Place, R." Other checks for
various amounts, and signed in the same manner, were
drawn by defendant on said bank, during the months of

July, September, October and November, 1890. All the checks were paid by the cashier from the general funds of the bank, and were entered on the books of the bank as charges against the "Russell County Place," a regular account with said place being kept on the books of the bank, just as other accounts were kept on its books. The account with said Russell county plantation commenced with the bank in 1886, and was continued regularly on the books of the bank until it made a general assignment, in March, 1891. None of the amounts drawn on said checks were paid to defendant, in person, but to Exton Tucker and others, by whom they were presented; and they purport on their face to have been given by defendant to such persons, for supplies and labor for said Russell county plantation. And defendant testified that these checks were all drawn in the regular course of business, with the knowledge and consent of all the officers of the bank, and that the bank's books were kept in respect thereto by the book-keeper of the bank, in the regular way that other accounts were kept on said books; and that there never was any agreement between defendant and such officers that any of the bank's money should be taken out, except in the regular course of business, and on checks drawn on and payable by said bank.

On January 3d, 1891, defendant and his brother gave the bank a paper drawn by W. N. and J. H. Reeves, on and accepted by W. N. and J. H. Reeves, for $6,692.08, payable on demand, to the order of C. Rhodes, cashier, at the John McNab Bank, Eufaula, Ala., which paper was so given to balance the account of the Russell county plantation on the books of the bank. This paper was never paid, and it passed to the bank's assignee under the deed of assignment of March, 1891. At the time it was given, W. N. and J. H. Reeves, as a firm and as individuals, were insolvent. When the bank failed and assigned in 1891 it had among its assets claims against various persons aggregating a large sum, a large proportion of which the testimony shows to be worthless, and among which last are the following:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Account on J. H. Reeves.. | | | | | | $ | 4,485 | 67 |
| Account on W. N. and J. H. Reeves | | | | | | | 6,849 | 30 |
| " | " | " | " | " | " agents | | 4,958 | 27 |
| " | " | C. Rhodes. | | | | | 2,000 | 00 |
| " | " | W. N. and J. H. Reeves | | | | | 55 | 00 |
| " | " | C. Rhodes | | | | | 4,000 | 00 |
| " | " | C. Rhodes | | | | | 47 | 69 |
| " | " | W. N. and J. H. Reeves | | | | | 5,553 | 50 |
| " | " | W. N. and J. H. Reeves | | | | | 5,954 | 55 |

| | | | |
|---|---|---|---|
| Account on | W. N. Reeves...................... | 24,624 | 92 |
| " | " W. N. Reeves...................... | 20,123 | 90 |
| " | " J. H. Reeves.:.................... | 7,943 | 65 |
| " | " J. H. Reeves..................... | 1,490 | 50 |
| " | " C. Rhodes....................... | 2,000 | 00 |
| " | " W. N. and J. H. Reeves........... | 6,692 | 08 |

And in addition to the above, which are shown by the testimony to be worthless, there is another claim against W. N. Reeves, the defendant, for $7,291.04, which the testimony shows to be worth its face value.

The amounts above shown against the cashier, Rhodes, were drawn by him on his own checks in June and July, 1890, and, according to the State's testimony, the checks were regularly entered on the books of the bank, to which defendant had access; but, according to defendant's own statement, the checks were not entered on the bank's books until the bank had assigned, and defendant disclaimed all knowledge of said checks until after the assignment. Defendant's own statement further showed that the amounts charged against him individually are against him and his brother jointly, were the accumulation of all his indebtedness to the bank since its organization, and that said sums were closed up on the books of the bank just before the suspension of the bank, and in order "to get the accounts of defendant and said firm closed up on the books."

The bank owed, at the time of its failure and assignment, $100,000, or more, to its depositors, and an additional $100,000, or more, to other creditors; and its assets were of comparatively little value. The bills receivable of the bank, including the claims just mentioned, amounted to $233,010.94. The "bills receivable book" of the bank had not been in possession of the bank since January 15, 1888; but a "bills receivable book" was made up by the book-keeper to March 30th, 1891, the date of the assignment, the entries on that book being brought forward from the old book by the book-keeper, who knew nothing about the items so brought forward.

The trial balance book of the bank, made up by the book-keeper, showed a surplus of $20,000.00 on March 31, 1891, and also showed, among other things, that drafts of W. N. and J. H. Reeves to the amount of $75,000, discounted by the John McNab Bank, had been re-discounted by that bank with banks in New York, on collaterals furnished by defendant and his said brother; and it was shown that said collaterals were insufficient to pay the drafts they were given to secure.

[Reeves v. The State.]

There was also testimony to show that the wives of defendant and his brother J. H. Reeves were each solvent, and owned considerable property in their own right; and defendant's proof tended to show that the property owned by his wife was acquired by her otherwise than from him. The remainder of the testimony it is unnecessary to notice.

The exceptions reserved by defendant to the rulings of the court on the testimony arise, in the first place, on the introduction in evidence of the several checks drawn by defendant on the bank on account of the Russell county plantation, other than the check for $558.34, which is the basis of the charge in the second count of the indictment, and as to which no objection was made. These objections were made both before and after the election of the State to proceed only on the second count of the indictment. The rulings of the court on these objections, both before and after the State's election, were in accord with the principles herein above laid down, and defendant's exceptions thereto were not well taken.

The objections of defendant to the testimony showing that the checks given by him for supplies and labor for the Russell county plantation were regularly entered on the books of the bank, which objections were made both before and after the State elected to proceed on the second count alone, were not well taken. It does not appear, either from the record, or from the briefs of counsel, why this testimony was offered by the State, or objected to by defendant. Naturally, its tendency would be to rebut the inference of fraud, by showing an absence of that concealment which usually attends fraud. False entries made in the books, if any, touching the transactions connected with the checks, made either by the defendant himself, or under his direction, would go far to give color to such transactions, and to fix their character as fraudulent; but the correctness or regularity of the entries as to said checks, in the books offered in evidence, does not appear to be challenged. Of course, there may be cases where all the officers or managers of a bank are so related, or mutually and collusively engaged in a scheme to unlawfully appropriate the funds of the bank to their own individual or joint use, as that it may be a matter of indifference whether the usual and regular entries are made or not, there being no risk or peril to accrue from a knowledge of such entries by any of such officers or managers; or such entries may be regularly kept up with the purpose of covering up the real nature of the transactions, by an appearance of fairness and regularity;

or there may even be over particularity in this respect, amounting to a badge of fraud in itself. But, whether that is the case here or not, the book entries as to said checks were so related to and connected with the main transaction as to constitute part thereof, and were proper evidence under the principles and authorities herein set forth.

The several objections to each of the checks, on the ground that they were paid to Tucker for plantation supplies, can not be sustained. There was no difference, in law, between the payment of the checks to defendant in person, and the payment of them to another by his direction, or at his instance; and although it appeared from the face of such checks that they were given for supplies for a plantation confessedly controlled and cultivated by defendant in part, it was, nevertheless, open to the consideration of the jury whether they were in fact given for such purpose, or whether in the light of all the testimony they were given for another and wrongful purpose sought to be hidden by the form in which such checks were drawn and paid. *United States v. Fish,* 24 Fed. Rep. 585; *U. S. v. Harper,* 33 Fed Rep. 484, 485.

After it was shown in evidence that all the checks drawn by defendant for said plantation, including the check mentioned in the second count of the indictment, were paid from the general funds of the bank, defendant objected thereto on that ground, and moved to exclude the same from the jury. Under the construction of the statute adopted by us in this case, the general funds of the bank constituted money "in the possession of such bank, or deposited therein," within the terms of the statute and the indictment. The objection, therefore, was not well taken, and there was no error in the action of the court in overruling it.

The several objections to the testimony showing that defendant, on the 3d day of January, 1891, gave the joint paper of his brother and himself for $6,692.08 to close up or balance the Russell county plantation account on the books of the bank for 1890, and to the evidence showing that this paper was never paid, and to the evidence that defendant and his brother were insolvent, have no merit. These were facts cognate to the main fact, and bearing on the question of intent; the proof, therefore, was properly admitted.

The objection to the evidence showing that the Russell county plantation belonged to the wife of defendant and his brother's wife jointly, was properly admitted; but whatever
4

force there may have been in the objection to this testimony when it was offered, the objection was cured by the subsequent testimony of the defendant himself, that he was personally interested in the control and management of the plantation.

There was objection by defendant to the testimony offered by the State showing the deed of assignment made by the bank in March, 1891, and showing by the trial balance of March, 1891, the condition of the assets and liabilities of the bank at the time of the assignment; that the bills receivable book had not been in possession of the bank since the year 1887, and that a fruitless search was made for it after the assignment; that a large part of the entries of the old book were brought forward into the new book by the book-keeper, who knew nothing of the several items so brought forward; that said book on March 15, 1891, showed bills receivable to the amount of $233.010.94; that certain claims against defendant individually, and jointly with his brother, and also against Rhodes, the cashier, were included in said amount; that the bank re-discounted with New York banks $75,000.00 of paper made by defendant and his brother on collaterals furnished by the McNab Bank and the defendant, and which were insufficient to pay the paper; that the trial balance book showed a surplus of $20,000 on March 30th, 1891; that the bank at the time of its assignment owed its depositors more than $100,000, and to other creditors an additional $100,000, or more, and showing its assets at the time of its suspension; that Rhodes, the cashier, drew out of the bank six or eight thousand dollars, in different amounts, and that defendant's said brother was likewise largely indebted to the bank, and that he was insolvent; that defendant, his brother, his son and Rhodes were the stockholders of the bank, and the amount of stock owned by each; that the checks offered in evidence were all the checks found after the assignment in the case kept by the bank for cancelled checks; that the Russell county plantation had a credit in 1887 of $2,345.00; and the testimony that defendant's wife was solvent when the draft for $7,480.00 was discounted for the Russell county place. All this testimony was within the legitimate range of proof in this case, and from which, in connection with the other proof, it was for the jury to consider whether there was a scheme to get the money of the bank, which defendant is charged in the indictment with having embezzled, into defendant's possession, by fraud and for his own use. It is true the defendant is not indicted for wrecking the

bank, nor for making false entries in the books, nor for con-
spiring with the other officers of the bank to misapply its
funds, nor is he punishable, under this indictment, for the
several acts of his brother and Rhodes in appropriating the
money of the bank to their own use; but the above men-
tioned facts, in connection with the other proof, all show a
long course of unlawful dealing in the affairs and manage-
ment of the bank, of which defendant, as its president, could
not have been ignorant, and which could not have occurred
without his participation, and which may shed light on the
motives and intent influencing him in the admitted appro-
priation to his own use of the money shown to have been
drawn out by him on said checks, including the one on
which the indictment is based.—Whar. Crim. Ev. § § 38, 46;
6 Amer. & Eng. Ency. of Law, 501, 503.

The tendency of the evidence is to show that defendant,
when the failure of the bank occurred, and the assignment
was executed, had withdrawn the funds of the bank on his
individual account to about, or more than, the amount of
his subscription to the capital stock of the bank; that
Rhodes, the cashier, had done the same; and that W. N.
Reeves, while drawing out proportionally less than the
others, had obtained about $10,000 on his individual ac-
count, and over $18,000 jointly with his brother, and, so far
as the testimony shows to the contrary, these large sums
were obtained by these managing officers of the bank with-
out any security. Furthermore, there is nothing in the
testimony, or of which the court can take judicial notice,
showing any unusual disaster or convulsion in the banking
or general business of the country. Yet there is no ex-
planation in the testimony of the cause or causes which
produced the failure and consequent assignment of this
bank.

These facts can not be disregarded in determining the
question of defendant's guilt or innocence, but must be con-
sidered in their relation to all the other testimony in the
case ; and the question for the jury is, whether upon all the
facts the defendant, while he was an officer, agent, clerk or
servant of the bank, fraudulently converted to his own use,
under the form or guise of loans, or by any means, or in
any manner shown by the testimony, the money, property
or effects belonging to the bank, or in possession of the bank,
or deposited therein, charged in the indictment to have been
embezzled by him, or converted to his own use. Embezzle-
ment is an offense that may be consummated in any manner
capable of effecting it, but it must distinctly appear that the

defendant acted with an unlawful intent indicating a design to defraud the bank.—6 Am. & Eng. Encyc. of Law, pp. 452, 453, 455.

Testimony was offered by the State, and objected to by defendant, to show that the wives of defendant and his brother, J. H. Reeves, were worth from twenty-five thousand to thirty thousand dollars each, during the year 1890. It was competent testimony, not as raising any inference that their property had been acquired wrongfully through the connection of their husbands with the bank, but as bearing upon the *bona fides* of defendant in drawing money from the bank for the ostensible purpose of running the plantation, when his wife had in her own right the necessary means therefor.

The testimony offered by the State, and objected to by defendant, showing that the Russell county plantation was worth from $6,000 to $9,000, and the stock and farming implements thereon were worth $1,000, was competent to be considered by the jury in connection with the further testimony that the amount drawn by defendant from the bank, ostensibly for supplies and labor for said place during the year 1890, amounted to $6,692.08, according to the paper of his brother and himself given to balance the account for that year, and amounting to over nine thousand dollars, if there is included the $2,345 to the credit of that account in 1887. From these facts, it was permissible for the jury to draw inferences as to the *bona fides* of defendant in drawing from the bank, for the ostensible purpose of paying for labor and supplies for making one year's crop on said place, a sum of money almost, if not quite, equal to the value of the plantation itself, and accordingly to determine from these facts, and all the other proof, whether the manner of obtaining the money, and the professed purpose for which it was obtained, were not a cloak or cover to some ulterior and wrongful purpose.

The testimony offered by the State, and objected to by the defendant, showing how the door of the bank building was arranged with reference to defendant's office, and the door from defendant's office into the office of the bank's attorney, and the condition of such doors ten or eleven days after the bank assigned and the assignee had taken charge, is stated with such vagueness and obscurity in the record that it does not appear what the testimony on that subject was. We can not see that the defendant was not injured by its introduction; on the contrary, its natural effect, probably, was to prejudice his case before the jury. It was irrele-

vant and incompetent testimony, and should have been excluded.

The testimony offered by the State, and objected to by defendant, that the defendant's brother had a private box in the bank building but not in the vault, and that said box contained no assets of the bank, and that defendant's brother removed said box from the building on the night of March 30th, 1891, without defendant's knowledge or consent, was not relevant to any issue in this case. There is nothing in the testimony to show what the box in fact contained, or that defendant had access to it while it was kept in the bank, or that it had any connection with, or relation to defendant's transactions with the bank; and the statement that it was removed by defendant's brother on the night before the assignment, without defendant's knowledge, relieves the latter from any unfavorable inference to be drawn from his brother's act. This testimony should have been excluded.

We have now considered all the objections arising on the testimony, and it remains to take up the several charges requested by defendant and refused by the court.

The charges numbered first, second, third, fourth, and eleventh, in the form which they were requested by defendant, confine and limit the question of fraudulent intent to the time of the receipt by the defendant of the money of the bank which he is charged with having embezzled. The fraudulent intent, which is a necessary ingredient of every offense of embezzlement, is the fraudulent intent with which the money or property *is appropriated to the use of* the party charged. In this case, if there was any embezzlement, or fraudulent conversion of the bank's money by the defendant, it must necessarily have been in and upon the receipt of the money drawn on defendant's check, so that here the receipt of the money and the appropriation of the money were one and the same act. As applied to the testimony in this case, therefore, these charges are not open to the objection that they limit the inquiry as to defendant's intent to the time of the receipt by him of the money he is charged with having embezzled. Nor are the first, second and third charges vicious in any other respect. They should have been given as requested, and their refusal was error.

The effect of the fourth charge, had it been given, would have been to unduly emphasize the testimony in the case exculpating in its nature, to the practical exclusion from the consideration of the jury of the testimony which is incriminating in its tendency. This charge, furthermore, invades the province of the jury. There is no absolute duty imposed

[Reeves v. The State.]

by law on the jury to believe that phase of the evidence most favorable to the defendant rather than that the tendency of which is to show his guilt. It is for the jury to determine from all the evidence whether they are satisfied beyond a reasonable doubt of the defendant's guilt, "and what conviction such evidence shall produce on their minds, or which theory will they accept."—*Fonville v. State*, 91 Ala. 39; *Mitchell v. State*, 94 Ala. 68; *Skipper v. Reeves*, 93 Ala. 332. This charge was properly refused.

The fifth and thirteenth charges asked by defendant are faulty in that they altogether ignore the *bona fides* with which the money may have been loaned by the officers of the bank to the defendant, notwithstanding the loan may have been made by them "in the usual way and manner of doing business by said bank," and was known to the ministerial officers of the bank. They withdraw from the consideration of the jury the question whether the defendant and the other officers of the bank resorted to the ordinary and usual form of a loan in order to cloak or cover up a fraudulent purpose to enable defendant to appropriate the money of the bank to his own use. They also ignore entirely the question of defendant's intent in obtaining the money. There was no error in the refusal of the court to give these two charges.

The sixth charge asked by the defendant was properly refused by the court. It postulates the right of defendant to an acquittal upon the fact that, at the time of discounting said draft, he had "no intent to embezzle the same, or fraudulently convert it to his own use," while the fact is, the defendant is not charged in the indictment with the embezzlement or fraudulent conversion of said draft. If the funds of the bank were procured by the discount of said draft, the embezzlement would have been of the funds, and not of the draft which defendant himself drew.—*Jackson v. The State*, 76 Ga. 551. The charge is, also, open to the objection, that it limits the inquiry as to defendant's intent to the time when the draft for $7,480 was discounted, to-wit, June 26th, 1890, whereas the evidence shows that the money defendant is charged with having embezzled was obtained by him before said draft was discounted, to-wit, on the 23d day of June, 1890. Other objections to this charge might be shown, but it is unnecessary to consider it further.

The seventh and eighth charges assert incorrect propositions of law, and their refusal was not error. They ignore entirely defendant's intent in obtaining the loan, and rest his right to an acquittal on the good faith of the officers of the bank in asking the loan. They also withdraw from the

consideration of the jury much of the material testimony in the case.

There was no error in the refusal of the court to give the ninth and tenth charges asked by defendant. The principles they assert are not in harmony with the construction we have placed on the statute.

The bill of exceptions states that the court consented to give the twelfth charge asked by defendant, and wrote on it the words, "*Given*, Carmichael, Judge;" and then by mistake the judge handed it to the clerk, with a bundle of refused charges, and, consequently, it was not read to, or considered by the jury. The bill of exceptions recites: "But the court gave substantially the same charge generally, and specifically at the request of the defendant." The charge, as requested, was erroneous, and defendant can not complain that an erroneous charge, although in fact marked given and intended to be given by the court, was not submitted to the consideration of the jury. The charge involves the assertion that, if the defendant obtained the money of the bank with the knowledge and consent of its managers, he would not be guilty, although at the time of so obtaining the money he may have had no intention of repaying it to the bank. It does not assert a correct proposition of law, and, moreover, its tendency was to mislead the jury.

The general charge for defendant was properly refused.

The ruling of the Circuit Court on defendant's motion for a new trial is not revisable in this court. The act of February 16, 1891 (Acts 1890–91), is limited by its terms to civil cases.—*Walker v. The State*, 91 Ala. 76; *Jolly v. State*, 94 Ala. 19.

For the errors pointed out above, the judgment of the court below is reversed, and the cause remanded for further proceedings in conformity with this opinion.

Reversed and remanded.