## C. Hunter Raine v. The State.

### (*Nashville.* December Term, 1920.)

1. CRIMINAL LAW. Provision of federal Constitution as to speedy trial does not apply to States.

As all of the first ten amendments to the United States Constitution are binding only on the United States and not on the States, one charged with an offense against the State laws cannot complain that he was not giving a speedy trial guaranteed by Const. U. S. Amend. 6. (*Post. pp.* 176-179.)

Cases cited and approved: Barron v. Baltimore, 7 Pet., 248; Arrowsmith v. State, 131 Tenn., 480.

Constitution cited and construed: Art. 1, sec. 9.

2. CRIMINAL LAW. Failure to make minute entries showing continuance does not deprive court of jurisdiction.

As Thompson Shannon's Code, section 7154, provides that after an indictment is found, no criminal prosecution can be dismissed, discontinued, or abandoned without leave of court, the fact that the clerk of the criminal court failed to make minute entries of several continuances did not cause the court to lose jurisdiction. (*Post, p.* 179.)

Cases cited and approved: Pierce v. Bank, 31 Tenn., 265; Harrison v. Commonwealth, 81 Va., 491; Ex Parte Owens, 52 Ala., 473.

Code cited and construed: Sec. 7154 (T.-S.).

3. CRIMINAL LAW. Presumption that good cause for continuance was shown.

Where a trial of a criminal prosecution was continued several times at the instance of the state, and no minute entries appeared on the record, it will be conclusively presumed that good ground for continuance under Thompson's Shannon's Code, section 7155, was shown, and that the trial court did not err in refusing to dis-

Raine v. State.

miss the prosecution after the first term, at which it was at issue. (*Post; pp.* 179-181.)

Case cited and approved:   Hobbs v. State, 121 Tenn., 413.

Constitution cited and construed: Art. 1, sec. 9.

4. **CRIMINAL LAW.** **Defendant not discharged as denied speedy trial where he acquiesced in postponement.**

Where defendant, who was indicted February 10th, arraigned February 12th, and admitted to bail the latter part of april, did not object to continuances entered at the June and September terms, he cannot insist that because of such poostponements he was denied the speedy trial guaranteed by Constitution article 1, section 9, and Shannon's Code, section 6951, for in order to entitle one under indictment and who is on bail to discharge for failure to grant him a speedy trial, he must place himself on record in the attitude of demanding a trial or resisting postponement; it appearing in the instant case that defendant acquiesced in at least one of the postponements.  (*Post, pp.* 181, 182.)

Cases cited and approved: Head v. State, 9 Okl. Cr., 356; Stewart v. State, 13 Ark., 720; Fox v. State, 102 Ark., 393; People v. Douglass, 100 Cal., 1; People v. Rongo, 169 Cal., 71; Maxwell v. State, 89 Ala., 150; State v. Slorah, 118 Me., 203; Flagg v. State, 11 Ga. App., 37;   Weeks v. State (Okl. Cr. App.), 183 Pac., 932; Phillips v. State 201 Fed., 259; In re Edwards, 35 Kan., 99.

5. **COURTS.** **Where United States has defendant in custody, State courts cannot interfere.**

Where the government of the United States had defendant in its custody for violation of a federal statute, the State courts cannot interfere with that custody, or remove the defendant therefrom for the purpose of trying him in the State court for an alleged violation of State law.  (*Post, pp.* 182, 183.)

Cases cited and approved: Ableman v. Booth, 21 How. 507; Tarble's Case, 13 Wall., 397; Robb v. Connolly, 111 U. S., 624; U. S. v. Harden (D. C.), 10 Fed., 802.

Statute cited and construed: Sec, 1030 (R. S.); Sec. 1696 (Comp. St.),

6. **COURTS.** Comity does not require a State to deliver to another State for trial one who has violated its own laws.

There is no comity whereby a State will turn over a prisoner held for violation of its. laws prior to expiration of his sentence for trial in another State for violation of the laws of the latter State; the uniform course being to the contrary. (*Post, p.* 183.)

Cases cited and approved: Matter of Troutman, 24 N. J. Law, 634; Taintor v. Taylor, 36 Conn., 242; Ex parte Rosenblat, 51 Cal., 285.

7. **CRIMINAL LAW.** Defendant serving federal sentence, held not entitled to discharge on ground that he was denied speedy trial.

Where defendant was indicated in February, 1914, and after several postponements, to which he acquiesced, he pleaded guilty in the United States court to a charge of violating a federal law, and was sentenced to five years in the federal prison, the fact that he was not brought to trial during the interim in which he was in the federal prison does not entitle him to discharge on the theory that he was not given a speedy trial guaranteed by Constitution article 1, section 9, and Shannon's Code, section 6951, for there is no federal law which would entitle the State to the custody of defendant for the purpose of a trial, and under no principle of comity would the United States have been required to give up defendant to the State. (*Post, pp.* 183, 184.)

Case cited and approved: Beavers v. Haubert, 198 U. S., 77.

8. **CRIMINAL LAW.** Overruling of motion to quash as to counts of the indictment on which defendant was acquitted not prejudicial.

Defendant cannot complain of the overruling of his motion to quash in so far as it applied to those counts of the indictment on which he was acquitted. (*Post, p.* 184.)

9. **INDICTMENT AND INFORMATION.** Matters of inducement need not be alleged with particularity.

Matters of inducement in a prosecution for fraudulent breach of trust denounced by Thompson's Shannon's Code, section 6580, wherein the means by which defendant obtained the property he

Raine v. State.

was alleged to have misappropriated were set forth, need not be averred with the same degree of particularity and certainty as those parts of the indictment describing the commission of the substantive offense. (*Post, pp.* 184-186.)

10. EMBEZZLEMENT. Banker, though not bailee, may be guilty of fraudulent breach of trust.

Thompson's Shannon's Code, section 6580, declaring that the fraudulent appropriation of personal property or money, by any one to whom it has been delivered on deposit, pledge, or sequestration, or to be carried, etc., or in whose hands or under whose control it may be by his position as clerk, etc., is a fraudulent breach of trust, applies to a bank official who has custody and control of the funds of a bank, though the funds are used in the banking business, and the banker cannot return the specific funds on demand, the section showing it is not restricted to bailments. (*Post, pp.* 184-186.)

Case cited and approved: Gillespie v. State, 25 Tenn., 169.

Code cited and construed: Sec. 6580 (T.-S.).

11. INDICTMENT AND INFORMATION. Motion to quash reaches only defects on face of indictment, and evidence is inadmissible in aid of motion.

Only infirmities appearing on the face of an indictment can be reached by a motion to quash, and evidence cannot be resorted to for the purpose of establishing such infirmities. (*Post. pp.* 186, 187.)

12. INDICTMENT AND INFORMATION. State not required to elect where various offenses are based on one transaction.

Where an indictment in several counts charged defendant with statutory larceny, embezzlement, and fraudulent breach of trust, but all of the courts were based upon the same transaction, the State could not be required to elect. (*Post, p.* 187.)

Cases cited and approved: Vinson v. State, 140 Tenn., 70; Cook v. State, 84 Tenn., 461.

13. EMBEZZLEMENT. Restitution is no defense to fraudulent breach of trust.

Where defendant, a banker, was acquitted of embezzlement, but convicted of fraudulent breach of trust, he was not entitled to a new trial on the ground that his restitution of the money taken brought him within the exception of Thompson's Shannon's Code, section 6575, for such exception applies only to embezzlement denounced by section 6574. (*Post, pp.* 187, 188.)

Acts cited and construed: Acts 1839, 1840, secs. 1-3, ch. 82.

Code cited and construed: Sec. 6574 (T.-S.).

14. EMBEZZLEMENT. Restitution is no defense save in case of embezzlement by public officer.

Thompson-Shannon Code, section 6575 declaring that if one shall account for and pay over all money collected, or received, he shall not be subject to punishment for embezzlement denounced by the preceding section, applies only to embezzlers of public, as distinguished from private funds, the preceding section dealing with embezzlement by public officers only. (*Post, p.* 188.)

15. CRIMINAL LAW. Finding of trial judge that jury was not influenced conclusive if supported.

Where it was asserted that the jury was improperly influenced or tampered with, a finding on motion for new trial by the lower court contrary to such assertion is conclusive where supported by any evidence. (*Post, pp.* 188-191.)

16. CRIMINAL LAW. Finding that jurors were not tampered with and received no messages warranted.

Where defendant sought a new trial on the ground that jurors were allowed to read newspaper accounts of the trial while it was in progress, and were allowed to separate, etc., a finding by the trial court that the jurors were not tampered with, and were not improperly influenced, the evidence showing that accounts in the papers were deleted before the jurors were allowed to read them, etc., *held* warranted. (*Post, pp.* 188-191.)

Cases cited and approved: Percer v. State, 118 Tenn., 765; Sherman v. State, 125 Tenn., 19.

Raine v. State.

17. **CRIMINAL LAW.** Embezzlement. Instruction in prosecution for fraudulent breach of trust properly refused.

In a prosecution for fraudulent breach of trust, where there was no evidence that defendant, a banker, acquired title to the moneys he was claimed to have misappropriated, an instruction that there could be no conviction if title passed to defendant was properly refused, where there was no evidence on the issue, and for the further reason that it was not essential that the identical money delivered should be returned. (*Post, p.* 191.)

18. **EMBEZZLEMENT.** Intent is not essential crime of fraudulent breach of trust.

The essence of fraudulent breach of trust denounced by Thompson's Shannon's Code, section 6580, does not embrace any intent to deprive the owner of his property, and no matter how good the intention of the defendant may be at the time of the misappropriation, he is guilty, and for that reason an instruction that there could be no conviction unless defendant converted the money with intent to deprive the true owners was properly refused. (*Post, pp.* 191, 192.)

19. **CRIMINAL LAW.** Trial judge can decline special requests unless they are strictly accurate.

The trial judge cannot be put in error for declining special requests unless they are strictly accurate in substance and in form. (*Post, pp.* 192, 193.)

20. **EMBEZZLEMENT.** Requested instruction on fraudulent breach of trust properly refused; ''legal tender.''

In a prosecution for embezzlement, larceny and fraudulent breach of trust by a banker who misappropriated funds, a request that he could not be convicted unless the jury should find he obtained from the bank legal tender in the form of good and lawful money of the United States was properly refused, the banker having been acquitted as to the first two offenses, for the instruction is erroneous, not only because making "legal tender" synonymous

with good and lawful money, which is not the law, but because of the use of the word "obtain," which would be applicable to the court on statutory larceny, but for fraudulent breach of trust. (*Post, pp.* 192, 193.)

Case cited and approved: Johnson v. State, 125 Tenn., 420.

21. EMBEZZLEMENT. Bank president may control funds and property, though cashier is executive officer.

While the cashier is the general financial executive officer of a bank, and as such has custody and control of the bank's property, funds and assets, yet the directors, where there is no inhibition in the bank's charter, may clothe the president with functions and duties which would otherwise repose in the cashier, or the president may by usage and custom exercise such power, so as to make him liable for fraudulent breach of trust. (*Post, pp.* 193-200.)

22. EMBEZZLEMENT. Bank president held to have custody of funds so as to be guilty of fraudulent breach of trust.

In a prosecution or fraudulent breach of trust under Thompson's-Shannon's Code, section 6580, against the president of a bank who misappropriated the funds of the institution, evidence *held* to establish his guilt of the offense charged, showing that he, and not the cashier, acted as the general financial executive offcer, and that he had control of the funds and property of the bank (*Post, pp.* 193-200.)

Cases cited and approved: State v. Kortgaard, 62 Minn., 7; Reeves v. State, 95 Ala., 31; Ker v. People, 110 Ill., 627.

Code cited and construed: Sec. 6545 (T.-S.).

---

FROM SHELBY.

---

Error to the Criminal Court of Shelby County.—HON. T. W. HARSH, Judge.

HUGH M. MAGEVNY and JNO. E. BELL, for Raine.

Raine v. State.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. EDWARD J. SMITH, Special Justice, delivered the opinion of the Court.

C. Hunter Raine, the plaintiff in error, hereinafter referred to as the defendant, was indicted in the criminal court of Shelby county on February 10, 1914, on an indictment charging him in three counts with embezzlment, fraudulent breach of trust, and statutory larceny of the sum of $788,804.76, good and lawful money of the United States, the property of the Mercantile Bank of Memphis, Tenn.

On July 15, 1919, he was convicted by the jury of fraudulent breach of trust, as charged in the second count of the indictment, and was sentenced to be confined in the penitentiary for not less than one nor more than ten years. From this judgment Mr. Raine has appealed to this court, and has here assigned fifteen errors.

Prior to the trial several motions were made on behalf of the defendant, and as they are not assigned in the order in which they were presented in the court below, we shall consider them rather in their logical order than that in which they appear in the formal assignments of error.

The fifteenth assignment of error is that the trial judge erred in overruling the defendant's motion for a discharge and for a dismissal of the case, made before the jury were sworn, on the ground that he had been denied the speedy public trial guaranteed to him by the sixth amendment to

the Constitution of the United States and by article 1, section 9, of the Constitution of Tennessee, and also by section 6951 of Shannon's Code of Tennessee, and upon the further ground that the court had lost jurisdiction of the case.

So far as any reliance is placed on the sixth amendment to the Constitution of the United States, the question need not be further considered, for, since the leading case of *Barron* v. *Baltimore*, 7 Pet., 248, 8 L. Ed., 672, it has been an elementary principle of constitutional law that amendments one to ten of the federal Constitution are binding only on action by the United States, and are not binding on the respective States. As this is a proceeding in a State court for the alleged violation of a State statute, it necessarily follows that no constitutional right can be predicated on the sixth amendment to the federal Constitution.

Turning, then, to the State Constitution, counsel for the defendant rely on the case of *Arrowsmith* v. *State,* 131 Tenn., 480, 175 S. W., 545, L. R. A., 1915E, 363. In this case it appeared that Arrowsmith, who had been indicted in eleven cases for forgery, was put on trial on one of the indictments, and duly sentenced and convicted therefor. While serving this sentence the trial court caused an order to be made and entered on the minutes that the remaining cases be retired from the docket until the expiration of the first sentence, which Arrowsmith was serving in the State penitentiary. When this sentence had been served the State attempted to try Arrowsmith on the remaining indictments, and he insisted that as the cases had

been by order of the court below retired from the docket, the court had lost jurisdiction thereof, and further that to try him on these other indictments· would be a. denial of his right to a speedy trial as guaranteed by article I, section 9, of the Constitution of Tennessee.  This contention was sustained, the court holding (1) that Arrowsmith was so conditioned while serving in the penitentiary that he could not personally demand that his own trial be proceeded with; and (2) that during the entire period of his incarceration in the penitentiary he was subject to the jurisdiction and orders of the court, and might at any time have been brought back to the trial court for trial on the other indictments then pending against him.

Bearing in mind the principles decided in *Arrowsmith* v. *State, supra,* the doctrine of which we conceive to be sound and in accordance with the overwhelming weight of authority involving questions similar to those there involved, we proceed to inquire whether the facts in the pending case bring it within the rules established by this court in the Arrowsmith Case.

As above stated, the defendant Raine was indicted on February 10, 1914, and on February 12, 1914, was arraigned on the indictment, and pleaded not guilty thereto. In default of bail the defendant remained in jail until the latter part of April, and in June of 1914 the case was called for trial, but was continued, on the court's own motion, because of inability to secure a jury. The record shows that there were no minute entries regarding this case by the clerk for the September term, 1914, nor for the January, May, or September terms, 1915; but begin-

ning with the January term, 1916, and for each term there-
after until the trial and conviction, the minutes show that
the case was continued from term to term, in each in-
stance upon motion of the Attorney General.   As above
stated, the defendant was on bail from the latter part of
April until he left for New York shortly after his case
was continued in June of 1914 on the court's motion; and
it further appears that this continuance was not opposed
by the defendant, but, on the contrary, was desired by
him, for the reason that, as he states, he was not then quite
ready for trial; the strong inference being that he was
then attempting to repay the sum which he was charged
with misappropriating from the bank, thereby hoping to
stop the criminal prosecution so far at least as the charge
of embezzlement was concerned, under section 6575,
Thompson's Shannon's Code.

The defendant, after the continuance in June of 1914,
left for New York City, where he remained until Febru-
ary 8, 1915, on which day he returned to Memphis and
pleaded guilty in the United States District Court in Mem-
phis to the charge of having used the mails for a fraudu-
lent purpose, and he received a five-year sentence in the
federal penitentiary at Atlanta, Ga.   He states that one
of his reasons for so pleading guilty in the federal court
was that he was advised by his counsel that this would
wipe out the State cases, and that they thought no further
action would be taken on them.

Mr. Raine was released from the Atlanta penitentiary
on October 17, 1918, and immediately went to New York,
where he remained until June 27, 1919, when he returned

to Memphis to go to trial in the criminal court of Shelby
county.

The defendant testified that he did not demand a trial
of any of his cases before entering the penitentiary at
Atlanta; that he did not demand a trial, nor ask his at-
torney to demand a trial while he was in the penitentiary
at Atlanta; and that he had never demanded a trial after
his release from the penitentiary at Atlanta, nor at any
other time.

We do not think that the failure of the clerk of the
criminal court of Shelby county to make minute entries
for the September term, 1914, and the January, May, and
September terms, 1915, showing a continuance of this case,
caused the court below to lose jurisdiction thereof.   By
section 7154 of Thompson's Shannon's Code it is expressly
provided that after an indictment is found, no criminal
prosecution can be dismissed, discontinued, or abandoned
without leave of the court.   Affirmative action of the court,
therefore, is a prerequisite to such dismissal, and the rec-
ord does not show that any such action was taken by the
court below.   This being true, we think it necessarily fol-
lows that there is no merit in the point made by defend-
ant's counsel that the court below lost jurisdiction of the
case, and, indeed, we think the question is settled adverse-
ly to such a contention, both in Tennessee and elsewhere.
*Pierce* v. *Bank,* 1 Swan, 265; *Harrison* v. *Commonwealth,*
81 Va., 491; *Ex parte Owens,* 52 Ala., 473.

Nor do we think that the defendant could insist that
the court below should have dismissed this case after the
first term at which it was at issue, for the reason that no

good cause was shown for its continuance under section 7155 of Thompson's Shannon's Code of Tennessee. In the absence of an affirmative showing to the contrary, which this record does not exhibit or reveal, it will be conclusively presumed that under this section of the Code good and sufficient cause was presented to the court below prior to ordering a criminal case continued. *Hobbs* v. *State,* 121 Tenn., 413, 118 S. W., 262, 17 Ann. Cas., 177.

These matters out of the way, the real question involved in this assignment of error is whether the defendant was denied the speedy trial guaranteed to him by article I, section 9, of the Constitution of Tennessee, so that he was entitled to his discharge on the petition filed on June 30, 1919.

From what has been before stated, it is apparent that in determining this question regard must be had to three periods of time, to-wit: (1) The period between the finding of the indictment on February 10, 1914, and the incarceration of the defendant in the federal penitentiary at Atlanta on February 8, 1915; (2) the period of defendant's term in said penitentiary from February 8, 1915, to October 17, 1918; (3) the period between the defendant's release from the penitentiary and the trial, to-wit, October 17, 1918, to June 30, 1919.

As to the periods of time from February 10, 1914, to February 8, 1915, and October 17, 1918, to June 30, 1919, the defendant was on bail, was represented by counsel in Memphis, and was himself for the most of these periods in New York City. He admits that during these periods no effort was made, either by him in person or by his coun-

sel, to secure a trial of this case, nor did he object to any continuance thereof being made on the motion of the district Attorney General. It is apparent.that he was during these periods very differently· circumstanced from what Arrowsmith was, in the case of *Arrowsmith* v. *State, supra.* The defendant, had he desired so to do, could have demanded a trial in the court below, or ·could Have .objected to any continuance thereof; but he did neither. Being at liberty under bail, he was in a position fully to assert and protect his rights, and as he admittedly did not do so by any affirmative action on his part, the question is, Has he lost the right to insist that under article I, section 9, of the Constitution of Tennessee he has been denied a speedy trial?

In order to entitle one under indictment, and who is on bail, to discharge for failure to bring him to trial, he must have placed himself on record in the attitude of demanding a trial or resisting postponement; he cannot acquiesce or consent to postponements, and thereafter insist that his right to a speedy trial under the Constitution has been violated and denied. *Head* v. *State,* 9 Okl. Cr., 356, 131 Pac., 937, 44 L. R. A. (N. S.), 871, and cases cited in note; *Stewart* v. *State,* 13 Ark., 720; *Fox* v. *State,* 102 Ark., 393, 144 S. W., .316; *People* v. *Douglass,* 100 Cal., 1, 34 Pac., 490·; *People* v. *Rongo,* 169 Cal., 71, 145 Pac., 1017; *Maxwell* v. *State,* 89 Ala., 150, 7 South., 824; *State* v. *Slorah,* 118· Me., 203, 106 Atl., 768, 4 A. L. R., 1256; *Flagg* v. *State,* 11 Ga. App., 37, 74 S. E., 562; *Weeks* v. *State* (Okl. Cr. App.), 183 Pac., 932; *Phillips* v. *State,* 201 Fed., 259, 120 C. C. A., 149; *In re Edwards,*

35 Kan., 99, 10 Pac., 539. See, also, 8 R. C. L., section 28, p. 74.

As to the period while the defendant was serving his sentence in the federal prison at Atlanta, and when he was under bond conditioned to appear from term to term in the criminal court of Shelby county, it must be conceded that the State could not by any legal process secure the person of the defendant and put him to trial in the criminal court of Shelby county. The rule is, of course, elementary that as the government of the United States had the defendant in its custody on a plea of guilty for violating a federal statute, the State court could not interfere with that custody or remove the defendant therefrom for the purpose of trying him in the State court for the alleged violation of a State statute. *Ableman v. Booth,* 21 How., 507, 16 L. Ed., 169; *Tarble's Case,* 13 Wall., 397, 20 L. Ed., 597; *Robb v. Connolly,* 111 U. S., 624, 4 Sup. Ct., 544, 28 L. Ed., 542.

We have not been cited to any federal statute, nor have we found any, providing for the removal of a prisoner from a federal penitentiary to a State court for trial therein while serving a sentence in the federal prison. Section 1030, Revised Statutes (U. S. Comp. St., section 1696), which deals with the criminal jurisdiction of the federal courts, provides that a prisoner may be brought into said courts on the written certificate of the judge or district attorney thereof. This statute obviously refers to removing a prisoner from a federal penitentiary to a federal court for appearance or trial, and affords no basis for the argument that such prisoner could be brought into a State

court for trial therein while serving a sentence in a federal penitentiary.

In *U. S.* v. *Harden* (D. C.), 10 Fed., 802, it was held that the method prescribed by the above-cited statute was the only authority for bringing a federal prisoner into court, and it therefore follows that during the period of the defendant's incarceration at Atlanta he was wholly beyond the jurisdiction of the State of Tennessee, which could not resort to any federal statute to bring him within its jurisdiction for the purpose of trial.

It is finally, however, insisted by counsel for the defendant that the State, had it attempted so to do, could have secured the defendant from the federal prison and put him to trial in Tennessee on the ground that the comity existing between different sovereignties would have warranted and sanctioned this course. We have been cited to no authority which even by analogy so holds, but the uniform rule with reference to one State turning over a prisoner held for violation of its laws, and prior to the expiration of his sentence, for trial in the demanding State, has been to the contrary. *Matter of Troutman,* 24 N. J. Law, 634; *Taintor* v. *Taylor,* 36 Conn., 242, 4 Am. Rep., 58; *Ex parte Rosenblat,* 51 Cal., 285; Spear on Extradition, 442; Clark's Criminal Procedure, 63.

We do not think that, with no power in the criminal court of Shelby county to take jurisdiction of the defendant from February 8, 1915, to October 17, 1918, the State can be charged with any needless, vexatious, or oppressive delay in permitting a further prosecution of the de-

fendant in the State court to await his release from the federal prison. *Beavers* v. *Haubert,* 198 U. S., 77, 25 Sup. Ct., 573, 49 L. Ed., 950.

While we have not been able to find any case or authority which expressly and directly adjudges the point just considered, nevertheless, reasoning from principle and analogy, we are of the opinion that no constitutional right of the defendant to a speedy trial was breached or violated by failure of the State to put him on trial during the period that he was serving a sentence in the federal prison at Atlanta. The fifteenth assignment of error is accordingly overruled.

The fourth assignment of error is to the effect that the trial judge erred in overruling defendant's motion to quash the indictment, while the fifth assignment is directed to the refusal of the trial judge to permit the defendant to introduce testimony in support of his motion to quash, touching banking customs and usages as to the management, custody, and control of bank funds by the officers thereof.

As the defendant, by construction of the verdict of the jury, has been acquitted of the charges of embezzlement and statutory larceny, as contained in the first and third counts of the indictment, respectively, he can only here challenge the action of the trial court so far as the same affected the second count of the indictment on which he was convicted by the jury, charging him with fraudulent breach of trust.

The first ground of the motion to quash the second count of the indictment was based on the ground that the aver-

ment in the indictment was vague, ambiguous, and uncertain, for the reason that it required the defendant to return the identical money which he had received into his custody and control of the bank, and at the same time required him to use said money from day to day in the business transactions of the bank; that these are inconsistent requirements, averring or alleging a trust agreement impossible of fulfillment.

Learned counsel for defendant in presenting and arguing these assignments of error, as well as others to be hereafter noticed, view section 6580 of Thompson's Shannon's Code of Tennessee, which defines fraudulent breach of trust, as embracing only bailments, and insist that before a conviction can be had under this statute it must be shown that the specific thing delivered was to be returned by the bailee to the owner or bailor. Obviously such a construction of the statute is too limited and narrow, for the act itself, after providing for the case of a bailment, expressly provides:

"Or on any other contract or trust by which he was bound to deliver or return the thing received or its proceeds, is a fraudulent breach of trust."

So construed, the second count of the indictment clearly means that the defendant was required to account for and to deliver to the bank on the latter's demand the money of the bank then in his hands and control, whether the original money received or the proceeds thereof accruing from the business transactions of the bank. It is also clear that the contract or trust agreement described in the second count of the indictment is no essential part of

the statutory offense of fraudulent breach of trust, but is merely inducement for the purpose of showing the manner and means by which the defendant obtained the property of the bank which he is charged with having misappropriated, and as a matter of inducement the same degree of particularity and certainty is not required in charging such contract or trust agreement as in charging those parts which describe the commission of the substantive offense charged. 22 Cyc., 300; *Gillespie* v. *State,* 6 Humph., 169. For these reasons we do not think the trial court erred in refusing to quash the second count of the indictment on the first ground of said motion.

The second and third grounds of the motion as directed to the second count tendered proof for the purpose of showing that according to banking usages and customs the trust or contract charged in the second count was legally impossible, in that the defendant could not return the specific funds and property on demand, as the contract under which he held said funds necessarily contemplated that they would be used from day to day in the business transactions of the bank.

Of course, on a motion to quash an indictment, the infirmity relied on must appear on the face of the indictment, and extraneous evidence cannot be resorted to for the purpose of establishing such infirmity. The trial judge, therefore, properly ruled that the evidence tendered by the defendant on the motion to quash could be offered by him as a defense on the merits, but could not be received or looked to by him on the motion to quash the in-

dictment which was made prior to the trial.   The fourth and fifth assignments of error are overruled.

The failure of the trial judge to require the state to elect upon which one of the three counts in the indictment it would go to trial is the subject-matter of the sixth assignment of error.   As the several counts in this indictment are all based upon the same transaction, the case is not one in which the state was required to make an election, under the rule laid down by this court in *Vinson* v. *State,* 140 Tenn., 70, 203 S. W., 338, but, on the contrary, in our opinion, falls within the rule laid down in *Cook* v. *State,* 16 Lea, 461, 1 S. W., 254.

The rule announced in *Vinson* v. *State, supra,* is applicable to an indictment, in support of which evidence is offered of more than one prosecution, each of which requires separate and distinct evidence in defense, evidence of other acts being offered to shed light on whether a particular substantive offense has been committed.

In cases similar to the case at bar, as, for instance, for larceny, or receiving stolen property, or charging kindred offenses, all being based on the same prosecution, the uniform practice has been not to require the State to elect, and we are of the opinion that the case at bar falls within this latter rule.   We do not think, therefore, that there is any merit in the sixth assignment of error, and it is overruled.

The eighth assignment of error is to the effect that the defendant was entitled to a new trial because he had personally paid over to the receiver of the Mercantile Bank the sum of $944,500 prior to his conviction, thereby bringing himself within the exception contained in section 6575

of Thompson's Shannon's Code. There are two answers to this assignment:

(1) This statute, which is section 3 of chapter 82, Acts of 1839 and 1840, sections 1 and 2 of which are compiled in section 6574, Thompson's Shannon's Code, is applicable only to embezzlement, of which charge the defendant was acquitted by the verdict of the jury.

(2) It has been recently held by this court in the case of *State* v. *Matthews,* Knoxville September term, 1920, that even this exception is applicable only to embezzlers of public as distinguished from private funds, and consequently, even had the defendant been convicted of embezzlement, he would not be within the exception to the statute on which he relies.

The thirteenth and fourteenth assignments of error are predicated on the refusal of the trial judge to grant the defendant a new trial: (1) Because the members of the jury were permitted to, and did, read newspaper accounts of the trial while the same was going on; and (2) because upon at least three occasions during the trial the members of the jury were allowed to separate, part of them not being in the custody, control, or sight of the officer having them in charge, and on one occasion the jury, or a part thereof, mingled with the public on a public street in Memphis. Mr. Sims Barinds, a private detective in the employ of O'Haver Detective Agency at Memphis, testified that on two occasions he saw copies of the Memphis Commercial Appeal delivered to the jurors at the Arlington Hotel; that on one occasion he saw a member of the jury talking to a Mr. Martin Isele at the cigar counter of the

Arlington Hotel, and that on another occasion some of the jurors had left the hotel and gone across the street, while the others, under the custody of the officers, were in the lobby of the Arlington Hotel. It was also claimed that Mr. Pumphrey, a member of the jury, had visited his office in company with the deputy sheriff having the jury in charge, and there looked over his mail and wrote some letters, the remainder of the jury being at the time locked up in their room, which was in another part of the building where Mr. Pumphrey's office was. All twelve of the trial jurors were presented in court and examined on defendant's motion for a new trial, and as a result thereof the trial judge held that there had been no communication with the jury, nor had it been in any method or form tampered with or influenced pending the rendition of its verdict. There was no testimony introduced in support of the motion for a new trial other than that by the witness Barinds and he did not claim that any information of any kind reached the jury, or that the jurors were influenced to the prejudice of the defendant. Each of the jurors denied having read any newspaper containing any reference to the trial, but stated that the copies of the paper furnished to them had all reference to the trial clipped therefrom by the deputy sheriff before they were allowed to read the same. As to the incident at the cigar counter in the Arlington Hotel, Mr. Isele testified that Mr. Pumphrey came to the counter to buy cigars, and that no reference was made by Pumphrey or by him to the case or trial. As to the letters which Mr. Pumphrey read at his office, it is uncontradicted that these were read

in the presence of the jury officer, Mr. King. The finding of the trial judge on evidence such as was presented to him is conclusive of the issue, if there is any material evidence to support his finding, and a careful reading of the evidence adduced before him on the motion for a new trial demonstrates that the defendant was tried by a jury which based its verdict solely on the testimony heard in court, and that no prejudice accrued to him during the trial of the case by reason of the matters testified to by Mr. Barinds.

Applying the rule announced by this court in *Percer* v. *State,* 118 Tenn., 765, 773, 103 S. W., 780, and *Sherman* v. *State,* 125 Tenn., 19, 60, 140 S. W., 209, we find no merit in these two assignments of error based on the alleged improper conduct of the trial jury, and they are therefore overruled.

The ninth, tenth, eleventh, and twelfth assignments of error are directed at the action of the trial judge in declining to give certain special requests in charge to the jury. Request No. 1 was to the effect that the jury could not convict the defendant under the second count of the indictment, unless they found that the contract and agreement between the defendant and the Mercantile Bank contemplated that the defendant should return to the bank the specific and identical money going to make up the sum of $778, 804.86, which came into defendant's possession by virtue of said contract and trust agreement.

As has heretofore been pointed out, learned counsel for defendant throughout the trial in the court below, as well as in this court, have construed our statute defining fraud-

ulent breach of trust as being synonymous with a technic-
al bailment, while the statute itself expressly provides
that the failure to return or deliver the thing received
or its proceeds is within the statute. The court, therefore,
did not err in declining to give the first special request
to the jury.

The second special request was to the effect that the de-
fendant could not be convicted if the title to the money
passed to the defendant, since in that case there could be
no bailment of said money. The trial judge acted cor-
rectly in declining to give this special request for two
reasons: (1) There was no evidence in the record to the
effect that the title to the money did pass to the defend-
ant; and (2) that it was not essential that the specific,
identical money delivered under the contract and trust
agreement to the defendant by the bank should be returned
by the defendant on demand.

The third special request reiterated the view of counsel
that the defendant could not be convicted under the sec-
ond count of the indictment, unless the jury found that
he was to deliver and account for said identical money to
the Mercantile Bank, and unless they should further find
that at the time the defendant appropriated and converted
said money he did so with the intent to deprive the true
owners thereof.

In addition to the legal fallacy contained in this request
as to the defendant's obligation to return the identical
and specific money intrusted to him by the bank, this re-
quest is further erroneous because the essence of fraud-
ulent breach of trust does not embrace any intent to de-

prive the true owners of their property, but fraudulently to appropriate the same to defendant's use.

No matter how good the intention of the defendant may be at the time of such fraudulent misappropriation, and no matter how honestly he intends to return the money which he fraudulently misappropriates, the offense under the statute is made out, and it is not essential or necessary to prove any intent on his part to deprive the owner of his property. This special request was therefore correctly refused by the trial judge.

The fourth special request is to the effect that the defendant could not be convicted unless the jury should find that he obtained from the bank legal tender in the form of good and lawful money of the United States. The request as framed is faulty in several respects, as it makes legal tender synonymous with good and lawful money of the United States, which is not the law, and it purports to instruct the jury that the defendant could not be convicted except upon proof that he obtained such legal tender from the bank. To use the word "obtain" would have been applicable to the count on statutory larceny; but as the defendant was acquitted on this count, the jury, so far as the second count was concerned, needed only to be instructed that the defendant was guilty if he fraudulently appropriated the bank's money. It is, of course, elementary that a trial judge cannot be put in error for declining special requests, unless they are strictly accurate in substance and in form. *Johnson* v. *State,* 125 Tenn., 420, 143 S. W., 1134, Ann. Cas., 1913C, 261.

Passing from these technical observations, however, the defendant admitted in the court below that he used for

his own private purposes, and through the medium of his cotton brokers permitted, $1,056,000 of the general funds of the bank to be checked out in order to pay personal demands made on him by his brokers. We find no merit in the assignment of error dealing with the refusal of the trial court to give the defendant's fourth special request, and it is accordingly overruled.

Assignments 1, 2, 3, and 7 are in substance to the same effect, to-wit, that the evidence clearly preponderates against the guilt of the defendant and in favor of his innocence of the crime of fraudulent breach of trust.

It is not insisted by defendant's counsel that under his own testimony he was not guilty of violating some law, but, on the contrary, his counsel with learning and ability argue that, if guilty of any offense, the defendant was guilty of statutory larceny, in that he, as president of the bank, never had, under any contract or trust agreement, the custody and control of the funds and property of the bank, but that the same were in the custody and control of Mr. Claude Anderson, the bank's cashier, from and through whom the defendant obtained said funds for his cotton transactions by trick, fraud, stratagem, or device, thereby making the defendant guilty, if at all, of statutory larceny under section 6545, Thompson's Shannon's Code.

It is undeniably true, as a general principle, that the inherent powers of the president of a bank over its property, of any description, are very slight, and it is likewise true, nothing else appearing, that the cashier is the general financial executive officer of the bank, and as such

143 Tenn.—13

has custody and control of the bank's property, funds, and assets. There is, however, no magic in mere names, and it is everywhere agreed that the directors, no inhibition being contained in the bank's charter, have power and authority to clothe the president of a bank with functions and duties which would otherwise repose in the cashier, or that such president may, by the usage and custom of the bank, exercise such powers with the consent of the bank's directors. 1 Morse on Banks and Banking, section 144 (b), 152 et seq.; 1 Michie on Banks and Banking, p. 706, and notes.

Considering the evidence with reference to the defendant's powers and duties as president of the Mercantile Bank, it appears that in the year 1883 this bank was organized through Mr. Raine's efforts, and that he was the cashier thereof from that year until the fall of 1905, when he resigned; but, being importuned by the board of directors, he returned to the bank in March of 1907, when he became its president, which position he retained until February of 1914. As a condition of accepting the presidency of the institution in March of 1907, Mr. Raine insisted that Mr. Claude Anderson, who had been in the bank for years, rising from the position of collector or call boy, should be made the cashier thereof, and this was acceded to by the board of directors.

Mr. Raine testified in this case that he was "always the executive officer of the bank," and it was shown in the evidence that he or the cashier, or either of them, had under an appropriate by-law power to borrow money on behalf of the bank and to pledge the bank's collateral

therefor.  It was further shown in evidence that the president or cashier had power to make loans on behalf of the bank, but not to the officers thereof, and that this power of so making loans from the bank's funds was, for the most part, exercised by the defendant.  These powers so vested in the defendant as president of the bank would otherwise have reposed exclusively in the cashier, and the course of business of the bank, which seemingly received the full approval of its board of directors, made the defendant, as he testified he was, "the executive officer of the bank," and as such gave him equal control and custody over the bank's funds and property with the cashier, Mr. Anderson.  In other words, a reading of the record with reference to the powers and duties of the defendant and Mr. Anderson, so far as the bank is concerned, convinces us that in substance and in reality Mr. Raine was the cashier of the bank and Mr. Anderson merely his assistant, and this regardless of what names may have been assigned to them.

In dealing with trustees or *quasi*-trustees, names become unimportant, but the substance of their powers and duties is everything.  Furthermore, to corroborate this view, which we think is abundantly sustained by the evidence, Mr. Anderson testified that as cashier his duty was "general supervision of the clerical work," and that whatever was done with reference to the use of the bank's funds by the defendant was done by him (Anderson) under the "directions" and "instructions" of the defendant.  That the defendant himself likewise considered that he was the chief financial officer of the bank is strongly evidenced

by the fact that in making loans from the bank's funds he did not view it necessary to deposit collateral therefor with the bank's cashier, and that when he was arraigned in the criminal court in February, 1914, he pleaded guilty, and thereafter testified that he alone was responsible for the abstraction of the bank's funds, and that Mr. Anderson was wholly innocent thereof.

In support of the view that the defendant had, as president of the bank, custody and control of its property and funds, the cases of *State* v. *Kortgaard,* 62 Minn., 7, 11, 12, 64 N. W., 51, *Reeves* v. *State,* 95 Ala., 31, 11 South, 158, and *Ker* v. *People,* 110 Ill., 627, 51 Am. Rep., 706, are instructive and persuasive. It is true that these cases dealt with statutes defining embezzlement, but an examination of these statutes shows that the offenses therein defined are legally equivalent to fraudulent breach of trust as defined in the statutes of Tennessee.

In *State* v. *Kortgaard, supra,* the Supreme Court of Minnesota held that if the position or employment of the accused as president of the bank gave him joint and concurrent custody or control with subordinate employees or agents of the bank, that would constitute such possession, custody, or control as would satisfy the requirements of the statute.

After examining the evidence showing that the accused was the managing officer of the bank, directed and controlled the making of its loans and discounts, and had general direction and control of its affairs, the court said:

"But the question is not what custody or control over the funds of banks have their presidents generally, merely

by virtue of their office, but what custody or control did this defendant in fact have over the funds of this bank."

In *Reeves* v. *State,* and *Ker* v. *People, supra,* the law as to custody and control under the facts of each particular case is stated in accordance with the rule laid down in the Kortgaard Case.

In the case at bar, as hereinbefore recapitulated, the evidence without contradiction shows that the defendant, according to his own testimony, had always been the executive officer of the bank since its organization in 1883; that he and the cashier were authorized to make all loans for the bank, acting separately or jointly; that only in few instances was a loan ever submitted to the discount committee of the bank, the practice being for this committee to examine and approve loans after they had been made by the defendant, and this by reason of the fact that the board of directors, as well as the examining committee, had unbounded confidence in the judgment and integrity of the defendant; and that the cashier, Mr. Anderson, in making the entries on the books of the bank, which operated to conceal the defendant's misappropriation of the bank's funds to his his own use, acted under the direction and instruction of the defendant as president and principal executive officer of the bank. Having therefore, the general management and direction of the bank, and having control and custody, either separately or jointly with Mr. Anderson, of its property and funds, the evidence shows that, beginning in about the year, 1903, the defendant began to speculate in cotton, which specu-

lation he carried on continuously until the failure of the bank in February of 1914; that knowing his connection with cotton speculations would destroy confidence in the bank, he used the fictitious names of A. Johnson and J. Johnson for the purpose of carrying on these speculations; that, beginning in about the year 1907, the defendant would make out a check payable to cash, and instruct and direct Mr. Anderson to place such check in what was known as the cashier's special account, which was supposed to be an account representing cash in the vault of the bank over and above the amount of cash needed by the tellers for the transaction of the bank's daily business; that this check would not go through the bookkeeper's hands, but a deposit slip would be entered by him, crediting the account of the defendant with the amount called for by the deposit slip, the check itself passing directly into the cashier's special account; that to meet margins which he was called on to put up by his cotton brokers they would draw on the account so maintained by the defendant, but without indorsing any of such checks, which was done under the instructions and directions of the defendant; that in carrying on these cotton speculations the defendant would use counter checks of the bank, and not his personal checks, for he did not want the same to appear on his stub book; that to prevent Mr. Anderson, the cashier, from knowing how these sums were used, the defendant informed Mr. Anderson that a cotton pool, consisting of a number of prominent gentlemen of Mem-

phis, most of whom were directors of the bank, had been formed and was making loans through the bank, which were secured by collateral in the defendant's possession, which was exhibited to Anderson, but which the defendant did not submit for his inspection, and which was not delivered into his custody, the defendant retaining possession of this collateral, which it developed was his own, and which was not hypothecated to secure any such loans, the defendant's purpose in so exhibiting the collateral to Anderson being to cause Anderson to believe that the directors were making the loans from the bank on such collateral; that in pursuance of this general scheme and plan, and with a view of preventing the defendant's loans from the bank from being known to its directors, at the close of each six-month period, namely, at the close of June and December of each year, the defendant's checks carried in the vaults of the bank where the cashier's special should have been, but where it was not, would be removed, and the American Exchange National Bank of New York would be charged on its account with the Mercantile Bank sums largely in excess of what was owing by the New York bank to the Memphis bank, and that a few days after these six-month periods the cashier's special would reappear, represented not by actual cash in the vault of the bank, but by the checks of the defendant, as hereinabove set out.

As a result of this means of using the bank's funds by the defendant, on February 8, 1914, and under pressure exerted by two vice presidents of the American Exchange

National Bank of New York, it was revealed that the bank's funds were short to the amount of $1,056,000 represented by the defendant's checks to the amount of $410,000, carried in the cashier's special account, and no cash being in that account, as there should have been, and by the sum of $596,000 charged to the American Exchange National Bank of New York in excess of what that bank really owed the Mercantile Bank of Memphis at that time. There is no controversy in the evidence that this sum of $1,056,000 was, by the method above described, passed to the credit of the defendant, and that the funds of the Mercantile Bank were drawn therefrom by the cotton brokers who represented the defendant in his speculations in cotton.

The above constitutes a fair summary of the proof touching the defendant's powers and duties as executive officer of the Mercantile Bank, and the method by which its funds were misappropriated and abstracted therefrom.

In view of the authorities hereinabove referred to, and under this virtually uncontradicted proof, we are of the opinion that there was sufficient evidence on which the defendant could have been legally convicted by the jury of fraudulent breach of trust under our statute, and the first, second, third, and seventh assignments of error are overruled.

All assignments made on defendant's behalf having been heretofore considered, and no reversible error being found in any of them, the judgment of the court below is affirmed.